## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

ABIGAIL BACON, et al.,

      Plaintiffs,

      v.

AVIS BUDGET GROUP, INC., and
PAYLESS CAR RENTAL, INC.,

      Defendants.

Civ. No. 16-5939 (KM) (JBC)

**MEMORANDUM OPINION**

**MCNULTY, U.S.D.J.:**

    The plaintiffs[1] have filed a putative class action against car rental companies Avis Budget Group, Inc. ("Avis") and an Avis subsidiary, Payless Auto Rental, Inc. ("Payless"). The Complaint alleges that the defendant rent-a-car companies routinely charged customers' credit and debit cards for ancillary products and services that the customers had not authorized, or even had declined. The plaintiffs, car rental customers who allegedly incurred such unauthorized charges, assert claims for damages under New Jersey, Florida, and Nevada consumer protection and unfair trade practices statutes, for unjust enrichment, and for conversion. They also seek injunctive relief. (*See* Compl., *passim.*)[2] Plaintiffs propose to certify a nationwide class action comprising five subclasses.

---

[1]    The named plaintiffs are Richard Alexander, Abigail Bacon, George Davidson, Jeannine DeVries, Lisa Geary, Yvonne Wheeler, and Arcadia Lee. ("Plaintiffs", as used herein, refers to named plaintiffs, not members of the putative class.)

[2]    Certain record items repeatedly cited are abbreviated as follows:

    "DE __" =        Docket Entry in this case

    "Compl." =      Complaint (DE 1)

Now before the Court are two motions for summary judgment. The first is brought by defendants jointly. (DE 81). Defendants' motion seeks an order compelling the plaintiffs to arbitrate their claims on an individual basis. The plaintiffs oppose that motion and cross-move for summary judgment that the claims not be arbitrated, but proceed in this Court. (DE 93).

The defendants' motion for summary judgment is denied outright to the extent it rests on the agreements signed in person by the plaintiffs when they rented their cars in the United States, and the plaintiffs' corresponding cross motion is granted to the same extent. Section II.D.1 & 2, *infra*.

The defendants' motion and the plaintiffs' cross motion are both denied to the extent that they rest on the agreement signed in person by the plaintiff who rented her car in Costa Rica, because factual issues remain. Section II.D.3, *infra*.

| | |
|---|---|
| "MTD Opinion" = | Memorandum Opinion, dated 6/9/2017 regarding previous Motion to Dismiss (DE 33), *Bacon v. Avis Budget Grp., Inc.*, No. 16-5939, 2017 WL 2525009 (D.N.J. June 9, 2017). |
| "Def. Br." = | Memorandum of Law in Support of Defendants Avis Budget Group, Inc. and Payless Car Rental Inc.'s Motion for Summary Judgment to Compel Arbitration (DE 81-1) |
| "DSMF" = | Defendants' Local Rule 56.1 Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment (DE 81-2) |
| "Pl. Br." = | Memorandum of Law in Support of Plaintiffs' Cross-Motion for Summary Judgment and Opposition to Defendants' Motion for Summary Judgment (DE 93-1) |
| "PSMF" = | Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts in Support of their Cross-Motion for Summary Judgment (DE 93-2) |
| "PRDSMF" = | Plaintiffs' Response to DSMF (DE 93-3) |
| "Def. Reply" = | Reply Brief Supporting Defendants' Motion for Summary Judgment and Opposing Plaintiffs' Cross-Motion for Summary Judgment (DE 96) |
| "DRPSMF" = | Defendants' Response to PSMF on cross-motion (DE 96-1) |
| "DRPR" = | Defendants' Reply to PRDSMF (DE 96-2) |

To the extent the motions rest on the terms of service on booking websites, I find that the record is not sufficiently developed. After appropriate discovery, the issue may be resolved on summary judgment or tried. Section II.E, *infra*.

## I. SUMMARY

### A. Procedural History

The plaintiffs filed their Complaint on September 26, 2016. Defendants initially moved to dismiss the Complaint and compel arbitration. (DE 16, 17). Because the defendants' motions to dismiss presented issues of fact, I denied those motions as offered and ordered limited discovery on the issue of arbitrability. (*See* MTD Opinion). In that Opinion, I described how discovery was necessary to develop the record on the question of whether the parties agreed to arbitrate so that the motion to compel could be decided on a summary judgment standard pursuant to the framework outlined in *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764 (3d Cir. 2013). (*See* MTD Opinion at 6-8).

Once discovery on the question of arbitrability was completed, the defendants filed the present motion for summary judgment to compel arbitration. Plaintiffs cross-moved for summary judgment on the same issue.

### B. The U.S. Plaintiffs' Rental Agreements and Rental Jackets

Six of the seven plaintiffs (the "U.S. Plaintiffs") rented cars in the United States—specifically, New Jersey, Nevada, or Florida. (DSMF ¶¶ 113, 123, 131, 146, 159, 168).[3] The seventh plaintiff, Arcadia Lee, rented a car in Costa Rica.[4]

The U.S. Plaintiffs signed identical one-page rental agreements (the "U.S. Agreement") to rent Payless cars. (PSMF ¶¶ 5-7).[5] Each U.S. Agreement is

---

[3]     These plaintiffs, and the states in which they rented cars, are Abigail Bacon (New Jersey), Jeannine DeVries (Nevada), Lisa Geary (Florida), Richard Alexander (Nevada), Yvonne Wheeler (Florida), and George Davidson (Nevada).

[4]     *See infra* Subsection I.C.

[5]     Copies of the U.S. Agreements that the U.S. Plaintiffs signed are located here: DE 81-37 at 33; DE 81-38 at 49; DE 81-39 at 30; DE 81-41 at 54; DE 81-42 at 22.

essentially a receipt. It itemizes charges and fees, lists basic identification information about the customer and the rented vehicle, and states pickup and drop-off details.

Each U.S. Plaintiff's signature appears immediately below the final paragraph of the U.S. Agreement. That final paragraph states, in part, as follows: "I agree the charges listed above are estimates and that I have reviewed&agreed to all notices&terms here and in the rental jacket." (DSMF ¶¶ 8, 108; PRDSMF ¶¶ 8, 108) (spacing *sic* in original). The U.S. Agreements do not specifically define what a "rental jacket" is, and the phrase is not capitalized or otherwise emphasized. (DSMF ¶ 8; PRDSMF ¶ 8; DRPR ¶ 8).

The defendants attach copies of what they identify as the rental jackets that correspond to the U.S. Agreements (the "Rental Jackets"). (DSMF ¶ 109).[6] These Rental Jackets, pre-printed documents about the size of standard sheet of paper (8.5"x11"), contain certain terms and conditions. (DSMF ¶ 9; PRDSMF ¶ 9). Folded into thirds, they are eventually used to enclose the U.S. Agreements, as described more fully below. (*Id.*; DSMF ¶ 15; PRDSMF ¶ 15; DRPR ¶ 15).

Payless rental sales associates are instructed to give a rental jacket to the customer after the customer signs the rental agreement. (DSMF ¶¶ 14, 36; PRDSMF ¶ 14; DRPR ¶ 14). They are also instructed to give a rental jacket to any customer who requests one. (DSMF ¶¶ 16, 36). However, rental sales associates are not trained to alert customers to the existence of the rental jacket or to any additional terms while the customer is reviewing the U.S. Agreement. (PRDSMF ¶ 36; DRPR ¶ 36).

After the customer signs the U.S. Agreement, the rental sales associate takes the signed agreement, folds the customer copy, inserts it into a Rental Jacket, and hands the customer the Rental Jacket with the copy of the signed

---

[6]     Copies of the Rental Jackets, which are substantively identical, are located here: DE 81-37 at 34-37; DE 81-39 at 31-35; DE 81-41 at 56-59; DE 81-40 at 60-63; DE 81-38 at 50-53; DE 81-42 at 23-26.

U.S. Agreement inside. (DSMF ¶¶ 14, 15; PRDSMF ¶¶ 14, 15; DRPR ¶¶ 14, 15). Thus the customer routinely receives the Rental Jacket only after signing the U.S. Agreement, unless the customer has specifically asked to see the Rental Jacket at some earlier time. (DSMF ¶¶ 32, 36).

That is essentially what occurred when each of the U.S. Plaintiffs rented a car. (DSMF ¶¶ 113, 119, 121, 123, 125, 127-29, 131, 138, 140-41, 146, 151-52, 154-55, 163, 165-66, 168, 180, 182, 185). The U.S. Plaintiffs did not ask to see the Rental Jacket; the rental sales associates did not mention anything about the Rental Jacket as the U.S. Plaintiffs were reviewing their Agreements; the U.S. Plaintiffs signed their Agreements; and then the rental sales associates folded the U.S. Agreements inside the Rental Jackets and handed them back to each U.S. Plaintiff. (*Id.*). It is undisputed that the U.S. Plaintiffs received the Rental Jackets at the rental counter only after they signed their Rental Agreements. (PSMF ¶¶ 1, 2; DRPSMF ¶¶ 1, 2).[7] None of the U.S. Plaintiffs, it seems, actually read the Rental Jacket when they received it.

The Rental Jacket, so called, is not actually titled as such; the actual title at the top of the page is "Rental Terms and Conditions." (DSMF ¶ 10; PRDSMF ¶ 10; DRPR ¶ 10). The Rental Jacket includes 31 paragraphs of terms and conditions in small but legible print. The word "jacket" is not found as a header anywhere in the document; it does appear in the text of the second numbered paragraph, which refers to the "Rental Document Jacket." (DE 81-11). The terms and conditions, as well as the layouts, are substantially the same across all six Rental Jackets provided to the U.S. Plaintiffs. Each includes the same arbitration provision, which states, in relevant part:

---

[7]     Plaintiffs Bacon and Wheeler do not remember receiving rental jackets during their rental transactions. (PRDSMF ¶ 14; PSMF ¶¶ 32, 42). However, defendants assert that Bacon and Wheeler did receive rental jackets and that their failure of recollection is insufficient to support an inference that Bacon and Wheeler did not receive them. (DRPR ¶ 14; DRPSMF ¶¶ 32, 42). It is undisputed that, if Bacon and Wheeler did receive rental jackets, they did so after signing the rental agreement. Since that timing in combination with the other circumstances precludes the U.S. Plaintiffs from agreeing to arbitrate, *see infra* Subsection III.D, this dispute is immaterial.

28. <u>Arbitration.</u>

. . . .

> Dispute Resolution: Except as otherwise provided below, in the event of a dispute that cannot be resolved informally through the pre-dispute resolution procedure, all disputes between you and Payless arising out of, relating to or in connection with your rental of a vehicle from Payless and these rental terms and conditions shall be exclusively settled through binding arbitration through the American Arbitration Association ("AAA") pursuant to the AAA's then-current rules for commercial arbitration. There is no judge or jury in arbitration. Arbitration procedures are simpler and more limited than rules applicable in court and review by a court is limited. YOU AND PAYLESS AGREE THAT ANY SUCH ARBITRATION SHALL BE CONDUCTED ON AN INDIVIDUAL BASIS AND NOT IN A CLASS, CONSOLIDATED OR REPRESENTATIVE ACTION. Notwithstanding any provision in these terms to the contrary, if the class-action waiver in the prior sentence is deemed invalid or unenforceable, however, neither you nor we are entitled to arbitration. . . . This arbitration agreement is subject to the Federal Arbitration Act. . . . Disputes and claims that are within the scope of a small claims court's authority, as well as disputes to or loss of a vehicle related to your Payless rental, are exempt from the foregoing dispute resolution provisions.

(DSMF ¶¶ 11-13, 21; PRDSMF ¶¶ 11-13, 21; DRPR ¶¶ 11-13).

The defendants keep the Rental Jackets at the rental counter, typically near the computer terminal or printer. (DSMF ¶¶ 35, 41; PRDSMF ¶¶ 35, 41; DRPR ¶¶ 35, 41). The parties provided photos of the rental counters where the U.S. Plaintiffs rented their cars in Tampa, FL and Las Vegas, NV to illustrate the physical layout.[8]

At the Las Vegas location, the Rental Jackets are located on a desk behind the counter where the rental associate stands. The desk on which they

---

[8]  *See* DE 93-5 at 141-44; DE 81-27; DSMF ¶ 51 (Las Vegas location photos). *See* DE 93-5 at 145-55; DE 81-32; DSMF ¶ 48 (Tampa location photos). The parties do not appear to have attached photos of the New Jersey location.

sit is lower than the counter, so the view of a customer who is standing more than a few feet away is obstructed. Even for a customer standing directly at the counter, only the bottom portion of the Rental Jacket page would be visible. The Rental Jackets are facing in the direction of the rental sales associate (*i.e.,* the text is upside-down from the customer's point of view).

The photos of the Tampa location are similar, except that the Rental Jackets are somewhat less obstructed by the counter ledge, and the bottom of the rental jacket is therefore more visible.

### C. Lee's Costa Rica Agreement

Arcadia Lee rented a car in Costa Rica from Payless's licensee, Las Cuatro Vias, S.A. ("LCV"). (DSMF ¶¶ 186, 192-93, 203). LCV uses an agreement that is printed on both sides of a single sheet of paper. (*Id.* ¶ 194). The front side is a receipt-like document, customized by insertions, that contains the essential terms of the particular transaction (the "Costa Rica Fill-In Agreement"). The back side of the paper includes general preprinted terms, in both English and Spanish, and is entitled Rental Agreement (the "Costa Rica Terms"). (*Id.* ¶ 194). Both the front-side Costa Rica Fill-In Agreement and the back-side Costa Rica Terms have their own signature lines for the customer to sign. (PRDSMF ¶ 194; DRPR ¶ 194). Lee signed the Costa Rica Fill-In Agreement on the front of the sheet, but did not separately sign the Costa Rica Terms on the back. (DE 81-8; PRDSMF ¶ 207; DRPR ¶ 207).

The front side of the Costa Rica Fill-In Agreement is a receipt-like agreement that bears the Payless logo as well as LCV's name and address. (DE 81-8; DSMF ¶ 195). It includes basic identification information about the customer and the rented vehicle, itemizes charges and fees, and identifies pickup and drop-off details for the rented vehicle. (DE 81-8). It also includes several provisions with blank lines next to them for the customer to initial to signify that it is accepted or declined. (*Id.*). These include a collision damage waiver, emergency roadside assistance, and supplemental liability insurance. (*Id.*). The collision damage waiver states that it is subject to capitalized "Terms and Conditions on this countract [*sic*]." (*Id.*). There is no document or

7

paragraph entitled "Terms and Conditions," however. The front side does not explicitly refer to content on the back side of the paper. (*Id.*). Aside from the reference in the collision damage waiver, the front-side Costa Rica Fill-in Agreement does not refer to, let alone identify, any separate terms and conditions. It does not refer to any extrinsic "Rental Agreement."

At the bottom of the front side appears the following admonition: "By signing below, you agree to the terms and conditions of this Agreement, and you acknowledge that you have been given an opportunity to read this Agreement before being asked to sign." (*Id.*; DSMF ¶ 197; PRDSMF ¶ 197; DRPR ¶ 197). Lee signed the front side just underneath that admonition. (DE 81-8).

The Costa Rica Terms, *i.e.*, the back of the sheet, bears the heading "Rental Agreement." It comprises 21 paragraphs in English and 21 paragraphs in Spanish on a single page. (*Id.*). The writing is quite small and difficult to read, at least in the Court's copy. (*Id.*). The first numbered English paragraph, titled "Parties," explains that the parties include LCV and the renter, defined as the "persons whose data is detailed on the face of this document and whose signatures are affixed at the bottom, as well as any other individuals or entities in which name the car-rental invoice is issued by instructions of the signatory who shall be jointly liable for the obligations hereunder acquired." (*Id.*; DSMF ¶ 196; PRDSMF ¶ 196; DRPR ¶ 196).

The Costa Rica Terms include a "Dispute resolution" clause, essentially an arbitration provision, which states as follows:

> Every controversy or dispute that may be related to this agreement or its performance, liquidation or interpretation shall be resolved in accordance with the following procedure: 1) The parties shall resort to conciliation mechanisms in accordance with the Conciliation Regulations of the Center for Conciliation and Arbitration of the Chamber of Commerce of Costa Rica. If the Parties have not reached a conciliation agreement within fifteen business day [*sic*] following the conciliation request, the controversy or dispute shall be resolved by

> means of 2) Arbitration proceedings, in accordance
> with the Arbitration regulation of said center, to
> which rules the parties subject themselves
> unconditionally. The Arbitration Panel shall be
> composed of one member and resolve [*sic*] pursuant
> to law.

(DE 81-8; DSMF ¶ 199).

The back side of the paper has its own signature line, at the bottom right corner. It is preceded by the following admonition: "By signing below, you agree to the terms and conditions of this Agreement," in English and Spanish. Lee did not sign the Costa Rica Terms on the back side of the paper. (DE 81-8; PRDSMF ¶ 207; DRPR ¶ 207; PSMF ¶ 48).

The parties attach a video of Lee's rental transaction at LCV in Costa Rica. (DE 93-5 at 138 (the "video")). This video shows Lee reviewing and signing the Costa Rica Agreement; it does not show that she ever turned over the Costa Rica Fill-In Agreement to review the Costa Rica Terms on the back. (*Id.*). The video shows the rental sales associate physically pointing to where Lee should sign the Costa Rica Fill-In Agreement on the front side, but it does not show the rental sales associate communicating to Lee that there is additional content on the back side of the paper. (*Id.*; PRDSMF ¶ 208; DRPR ¶ 208).

During the transaction, Lee can be heard asking, "do you want me to sign next to each one?" The evident reference is to the initial lines on the front requiring the customer to accept or decline the collision damage waiver, the emergency roadside assistance sentence, and the supplemental liability insurance. (Video at 34:35 – 34:45). The rental sales associate responds, "at the end, please", and points to the signature line at the bottom of the front side. (*Id.*). Later on, the rental sales associate gives the paper back to Lee and says, "sign the initials for your name; one, two, three, and at the end, alright?" (Video at 54:27 – 54:59). After Lee signs the front side, the rental sales associate takes back the paper. (*Id.*). Neither the testimony nor the video suggests that Lee asked any questions about the Costa Rica Terms or turned the sheet over during this rental transaction. (DSMF ¶ 208).

### D. Third-Party Booking Websites

Payless has business relationships with travel booking websites such as Expedia.com, Hotwire.com, and Priceline.com (collectively, "the Booking Websites"). (DSMF ¶ 54). These Booking Websites provide online reservation services and assist users in making car rental reservations with vendors, including Payless. (*Id.* ¶ 56). Five of the six U.S. Plaintiffs used those websites to reserve their car rentals online.[9]

The defendants attach the Booking Websites' Terms of Use that were in effect at the time the five U.S. Plaintiffs reserved their car rentals. (*Id.* ¶¶ 76, 83, 92).[10] To use the Booking Websites to reserve their rentals, the five U.S. Plaintiffs had to click boxes acknowledging that they had read and agreed to the Booking Websites' Terms of Use. (DSMF ¶¶ 68-69, 77, 84-85, 93, 99, 100). The Terms of Use for each of the Booking Websites included an arbitration provision.

The arbitration provision included in the Expedia.com Terms of Use provided the following: "Any and all Claims will be resolved by binding arbitration, rather than in court. . . . This includes any Claims you assert against. . . travel suppliers or any companies offering products or services through us (which are beneficiaries of this arbitration agreement)." Such arbitration, it provides, "will be conducted only on an individual basis and not in a class, consolidated or representative action." (DSMF ¶¶ 61, 78; DE 81-30 at 37-47). It also states that "[y]ou agree to give us an opportunity to resolve any disputes or claims relating in any way to. . . any services or products provided" and that "[i]f we are not able to resolve your Claims within 60 days,

---

9     Specifically, the five plaintiffs and the websites they used are as follows: Richard Alexander (Expedia.com); Lisa Geary (Expedia.com); Abigail Bacon (Hotwire.com); Jeannine DeVries (Hotwire.com); and George Davidson (Priceline.com). (DSMF ¶¶ 65, 66, 81, 82, 97).

10     Plaintiffs dispute the admissibility of the Booking Websites' Terms of Use and website layouts as presented by defendants. (PRDSMF ¶¶ 58, 61-63, 67-69, 76-78, 83-85, 92-94, 98-100, 104-06; DRPR ¶¶ 58, 61-63, 67-69, 76-78, 83-85, 92-94, 98-100, 104-06). I address this question below. *See infra* Subsection III.D.4.

you may seek relief through arbitration or in small claims court . . . ." (*Id.*; DSMF ¶ 79). The terms "we", "us", and "our" are defined to refer to Expedia, Inc., and its subsidiaries and corporate affiliates, including Travelscape, LLC. (*Id.*). The term "you" is defined to mean the customer visiting or booking a reservation through Expedia.com. (*Id.*). "Expedia Partner" is defined as "any co-branded and/or linked website through which we provide links, content or service." (*Id.*).

Hotwire.com's Terms of Use are identical, except of course that "we", "us", and "our" refer to Hotwire, Inc. and the term "Expedia Partner" is absent. (DSMF ¶¶ 62, 94; DE 81-30 at 81-101).

The arbitration provision in the Priceline.com Terms of Use provided the following: "ANY AND ALL CLAIMS MUST BE RESOLVED BY BINDING ARBITRATION. . . AND IT PREVENTS YOU FROM PURSUING A CLASS ACTION OR SIMILAR PROCEEDING IN ANY FORUM. THESE LIMITATIONS APPLY TO ANY CLAIMS AGAINST. . . ANY TRAVEL SERVICE PROVIDERS OR COMPANIES OFFERING PRODUCTS OR SERVICES THROUGH THE SITE." (DSMF ¶¶ 63, 104; DE 81-30 at 48-79). It defines "third-party suppliers or providers" as including "the airlines, hotels, rental car companies and other suppliers that provide travel or other services through this Site (such third parties collectively referred to as the 'Travel Service Providers')." (*Id.*). It requires a Notice of Dispute prior to any arbitration; "If Priceline and you, or Priceline and any Third-party, do not reach an agreement to resolve the Claim within 60 days after the Notice is received, you, or the Third-party, may commence an arbitration proceeding." (*Id.*). It also includes a class-action waiver. (*Id.*).

None of the plaintiffs who reserved their rentals with the Booking Websites suggest that they had any problems with the reservation process. The basis for those plaintiffs' claims against defendants involve the alleged unauthorized charges for ancillary services after the plaintiffs returned their cars.

11

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth the types of evidence on which a nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an

12

essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

When the parties file cross-motions for summary judgment, the governing standard "does not change." *Auto-Owners Ins. Co. v. Stevens & Ricci, Inc.*, 835 F.3d 388, 401 (3d Cir. 2016) (citing *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)). The court must consider the motions independently, in accordance with the principles outlined above. *Goldwell of N.J., Inc. v. KPSS, Inc.*, 622 F. Supp. 2d 168, 184 (D.N.J. 2009); *Williams v. Philadelphia Housing Auth.*, 834 F. Supp. 794, 797 (E.D. Pa. 1993), *aff'd*, 27 F.3d 560 (3d Cir. 1994). That one of the cross-motions is denied does not imply that the other must be granted. For each motion, "the court construes facts and draws inferences in favor of the party against whom the motion under consideration is made" but does not "weigh the evidence or make credibility determinations" because "these tasks are left for the fact-finder." *Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008) (internal quotation and citations omitted); *see also Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

Because arbitration is a "matter of contract" between two parties, "a judicial mandate to arbitrate must be predicated upon the parties' consent." *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 771 (3d Cir. 2013) (quoting *Par–Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 54 (3d Cir. 1980)). Pursuant to the Federal Arbitration Act ("FAA"), a court may enforce a contract to arbitrate, but only if the court is satisfied that the "making of the agreement" to arbitrate is not "in issue." *Id.*; *ACE Am. Ins. Co. v. Guerriero*, 738 F. App'x 72, 77 (3d Cir. 2018) ("Before compelling arbitration, . . . courts must be satisfied that the parties have an agreement to arbitrate because 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he [or she] has not agreed so to

submit.'") (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648, 106 S. Ct. 1415 (1986)).

A motion to compel arbitration is evaluated under the summary judgment standards outlined above. *Id.* at 77. Thus arbitration will be compelled if the arbitrability issue presents no genuine, material issues of fact, with "[t]he party opposing arbitration . . . given the benefit of all reasonable doubts and inferences that may arise." *Id.* (quoting *Kaneff v. Del. Title Loans,* 587 F.3d 616, 620 (3d Cir. 2009)). If, on the other hand, there are material factual disputes regarding arbitrability, the court should proceed to trial "regarding 'the making of the arbitration agreement or the failure, neglect, or refusal to perform the same,' as Section 4 of the FAA envisions." *Id.* (quoting *Somerset Consulting, LLC v. United Capital Lenders, LLC*, 832 F. Supp. 2d 474, 482 (E.D. Pa. 2011)).

## III.    DISCUSSION

### A. The Framework on Motions to Compel Arbitration

Federal law is decidedly pro-arbitration. The FAA's purpose is "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 24, 111 S. Ct. 1647 (1991). Thus, the statute makes agreements to arbitrate "valid, irrevocable, and enforceable," 9 U.S.C. § 2, subject only to traditional principles of contract formation and interpretation. The FAA provides that contract provisions manifesting the intent of the parties to settle disputes in arbitration shall be binding, allows for the stay of federal court proceedings in any matter that is referrable to arbitration, and permits both federal and state courts to compel arbitration if one party has failed to comply with an agreement to arbitrate. 9 U.S.C. §§ 2-4. Cumulatively, those provisions "manifest a liberal federal policy favoring arbitration agreements." *Gilmer,* 500 U.S. at 24, 111 S. Ct. 1647 (quotations omitted).

14

The relevant inquiry encompasses two questions: (1) whether the parties agreed to arbitrate; and (2) whether the dispute is within the scope of the agreement. *Sarbak v. Citigroup Global Markets, Inc.,* 354 F. Supp. 2d 531, 536–37 (D.N.J. 2004); *see also Green Tree Fin. Corp. v. Bazzle,* 539 U.S. 444, 452, 123 S. Ct. 2402 (2003); *ACE Am. Ins. Co. v. Guerriero*, 738 F. App'x 72, 77 (3d Cir. 2018).[11]

To decide the first question, whether the parties have agreed to arbitrate, the courts apply state contract law. "Before a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there should be an express, unequivocal agreement to that effect." *Griswold v. Coventry First LLC,* 762 F.3d 264, 270 (3d Cir. 2014) (quoting *Par–Knit Mills,* 636 F.2d at 54). But even facially neutral state laws, the Supreme Court has recently held, will be set aside if they discriminate against agreements to arbitrate vis-à-vis other contracts:

> The FAA . . . preempts any state rule discriminating on its face against arbitration—for example, a "law prohibit[ing] outright the arbitration of a particular type of claim." . . . . And not only that: The Act also displaces any rule that covertly accomplishes the same objective by disfavoring contracts that (oh so coincidentally) have the defining features of arbitration agreements.

*Kindred Nursing Centers Ltd. P'ship v. Clark,* 137 S. Ct. 1421, 1426 (2017) (quoting *AT & T Mobility LLC v. Concepcion,* 563 U.S. 333, 341, 131 S. Ct. 1740) (sarcasm in original). So the court, in applying contract law, must keep in mind not only the general "strong federal policy in favor of arbitration," *John Hancock Mut. Life Ins. Co. v. Olick,* 151 F.3d 132, 137 (3d Cir. 1998), but also the *Kindred* preemption principle.

---

[11]    The cited cases state a third factor: whether Congress nevertheless intended the dispute to be non-arbitrable. Because the parties point to no statutory prohibition, that factor does not apply here.

The second question, whether the dispute falls within the scope of the arbitration agreement, is decided under federal law. *Century Indem. Co.,* 584 F.3d at 524. "When the parties have a valid arbitration agreement, 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Guerriero,* 738 F. App'x at 77-78 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626, 105 S. Ct. 3346 (1985)). *Accord Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 103 S. Ct. 927 (1983).

### B. The Parties' Arguments

In broad strokes, the defendants argue that the arbitration provisions in the Rental Jackets and the Costa Rica Terms are enforceable and that the plaintiffs' claims fall within the scope of those arbitration provisions. Further, they argue that the class-action waivers in the arbitration provisions require the plaintiffs to bring their claims on an individual rather than a class-wide basis. Although Avis is not a signatory to the Rental Jackets, and neither defendant is a signatory to the Costa Rica Terms, they say they may enforce the arbitration provisions under principles of agency law and equitable estoppel. Furthermore, defendants argue, the plaintiffs who reserved their car rentals through the Booking Websites can be compelled to arbitrate their claims based on the arbitration provisions found in the Booking Websites' Terms of Use. According to defendants, then, all of the plaintiffs must submit their claims against Avis and Payless to arbitration, and on an individual basis—the U.S. Plaintiffs in the United States, and Lee in Costa Rica.

As plaintiffs see it, arbitration cannot be compelled here. The U.S. Agreements and the Costa Rica Fill-In Agreement do not effectively incorporate by reference the Rental Jackets or the Costa Rica Terms, including the arbitration clauses therein. Assuming *arguendo* that the Rental Jackets and Costa Rica Terms are effective, plaintiffs make additional arguments that these disputes are beyond the scope of the arbitration agreements.

Particularly for the Rental Jackets, I agree with the plaintiffs that the incorporation-by-reference issue precedes all others. If plaintiffs are correct,

there is no agreement to arbitrate at all, so issues of interpretation and scope become moot.

Additionally, Plaintiffs argue that they cannot be compelled to arbitrate their claims pursuant to the arbitration provisions in the Booking Websites' Terms of Use. The evidence of those terms, they say, is not competent or admissible. And even if those terms are admissible, plaintiffs say, they never assented to them. Further, the plaintiffs argue that these disputes are beyond the scope of the Booking Website arbitration clauses, because they do not involve the reservations, but rather the unauthorized charges imposed after the rental transactions had concluded.

### C. Choice of Law

As noted above, courts apply state contract law to determine whether parties have agreed to arbitrate. *ACE Am. Ins. Co. v. Guerriero*, 738 F. App'x 72, 78 (3d Cir. 2018). Plaintiffs rented the cars in New Jersey, Nevada, Florida, and Costa Rica. Thus a threshold choice-of-law question is presented.

In its Opinion denying the defendants' motions to dismiss, the Court conducted a choice-of-law of analysis with respect to the incorporation-by-reference issue. (MTD Opinion at 11-16). The analysis of the MTD Opinion should be consulted, but for convenience I briefly summarize it here. *Id.*, available as *Bacon v. Avis Budget Grp., Inc.*, No. 16-5939, 2017 WL 2525009, at *6-*10 (D.N.J. June 9, 2017).

In diversity actions a district court must apply the choice-of-law rules of the forum state—here, New Jersey—to determine which state's law will govern. *Id.* New Jersey uses the most-significant-relationship test. Initially, the court must determine whether a conflict actually exists between the potentially applicable laws. *Id.* If no conflict exists, the law of New Jersey, the forum state, applies. *Id.* If a conflict does exist, the court must determine which state has the most significant relationship to the claim. *Id.*

Upon conducting this analysis in my earlier opinion, I initially determined that there is no relevant distinction between the laws of New Jersey

and Nevada, but that there is a distinction between New Jersey and Florida law. I held that the threshold incorporation-by-reference issue—*i.e.,* whether the U.S. and Costa Rica arbitration provisions are effectively incorporated by reference from an extrinsic document—is governed by New Jersey contract law as to plaintiffs Bacon, Alexander, DeVries, Davidson, and Lee. The same issue, however, is governed by Florida contract law as to plaintiffs Geary and Wheeler. *Id.*

"Because choice of law analysis is issue-specific, different states' laws may apply to different issues in a single case, a principle known as 'depecage.'" *Berg Chilling Sys., Inc. v. Hull Corp.,* 435 F.3d 455, 462 (3d Cir. 2006). As to arbitrability under the Booking Websites' Terms of Use, however, I have not yet determined which state's law applies. Still, I find that I do not have to reach that issue in this Opinion. *See* Subsection III.D.4, *infra.*

### D. The U.S. and Costa Rica Agreements

The main thrust of the defendants' position is that the plaintiffs, at the time they picked up their rental cars, signed rental agreements that contained or incorporated agreements to arbitrate.

I first discuss the U.S. Agreements. As I say, New Jersey and Florida law govern the issue of whether the Agreements signed by the U.S. Plaintiffs effectively incorporated the arbitration clauses in the Rental Jackets. Ordinary principles of New Jersey and Florida contract law determine the validity of an agreement containing an arbitration clause. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S. Ct. 1920 (1995).

As to the issue of mutual assent for the U.S. Plaintiffs, I essentially hold as follows: The Rental Jackets are separate from the U.S. Agreements that the customers signed. The relevant arbitration language appears only in the Rental Jackets, not in the Agreements. There can be no mutual assent with respect to terms in a document that the parties do not understand to be part of the contract. Therefore, a fundamental question is the extent to which the Rental Jackets were available for the customers' inspection when they signed the U.S. Agreements. Since the Rental Jackets were not adequately presented to the

18

plaintiffs until after they signed the U.S. Agreements, and because the Agreements did not describe the Rental Jackets in a way that would be clear to the reader, I hold that the U.S. Agreements did not adequately incorporate the Rental Jackets under New Jersey or Florida law.

With respect to the Costa Rica Fill-In Agreement, my resolution is different. I hold that there is a question of fact whether Lee was given reasonable notice of the Costa Rica Terms, and I therefore deny both parties' motions for summary judgment on this issue.

### 1. New Jersey Law and the U.S. Agreements

The agreements signed by Bacon, Alexander, DeVries, and Davidson in the United States are governed by New Jersey law. Because they are substantially identical, I discuss them together.

Under New Jersey law, "'[a]n agreement to arbitrate, like any other contract, must be the product of mutual assent, as determined under customary principles of contract law.'" *James v. Glob. TelLink Corp*, 852 F.3d 262, 265 (3d Cir. 2017) (quoting *Atalese v. U.S. Legal Servs. Grp., L.P.*, 219 N.J. 430, 99 A.3d 306, 312-13 (2014)). "Mutual assent requires that the parties have an understanding of the terms to which they have agreed." *Atalese*, 219 N.J. at 313. As the New Jersey Supreme Court explained, this principle is especially important in arbitration cases, "because arbitration involves a waiver of the right to pursue a case in a judicial forum"; courts will therefore "take particular care in assuring the knowing assent of both parties to arbitrate, and a clear mutual understanding of the ramifications of that assent." *Id.* (internal quotations omitted).

Before a separate document will be deemed to be incorporated by reference into a contract, New Jersey requires a high degree of certainty:

> In order for there to be a proper and enforceable
> incorporation by reference of a separate document, the
> document to be incorporated must be described in
> such terms that its identity may be ascertained beyond
> doubt and the party to be bound by the terms must
> have had "knowledge of and assented to the
> incorporated terms."

*Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn*, 410 N.J. Super. 510, 533, 983 A.2d 604, 617 (App. Div. 2009) (quoting 4 Williston on Contracts § 30:25 (Lord ed. 1999)); *James*, 852 F.3d at 266. That principle implies that the Court can find an agreement to arbitrate only if

(a) the Agreements describe the Rental Jackets in such a way that it is clear beyond doubt that they were incorporated in the Agreements (the "description factor"); and

(b) that the plaintiffs knew of, and assented to, the terms within the Rental Jackets (the "knowledge and assent factor").

Those two factors overlap. The more detailed the description, for example, the more likely it is that the signer of the contract gained actual or constructive knowledge of the external document.

The plaintiffs contend that they never agreed to arbitrate because the U.S. Agreements do not validly incorporate the Rental Jackets. That argument relies heavily on *Quinn, supra*, which I discussed in detail in my earlier Opinion. (*See* MTD Opinion at 17-19). As to the description factor, the *Quinn* court reasoned that the extrinsic document sought to be incorporated was not clearly identified because the agreement's general reference to policies and procedures "contained no document dates or an identifiable publication number," for example, and was "in no way specific or identifiable such that the [law firm's] practices and policies [could] be ascertained beyond doubt." *Quinn*, 410 N.J. Super. at 535 (internal quotation marks omitted). As to the knowledge and assent element, "there [was] no indication that the terms of the proposed incorporated document were known or assented to by defendants" because the "defendants were not shown and did not see the [proposed incorporated] document until" after signing the main contract. *Id.* at 535.

Like the contract in *Quinn*, the U.S. Agreement here failed to define the Rental Jacket with sufficient specificity. It purports to bind the rent-a-car customers "to all notices&terms here and in the rental jacket." "Rental jacket," a bit of industry jargon, is not highlighted or emphasized, and it does not have

20

a self-evident meaning. It is not defined in the Rental Agreement, by words or ostension. The Agreement's reference to the "rental jacket," like the cross-reference in the *Quinn* contract, "contained no document dates or an identifiable publication number." 410 N.J. Super. at 535. By design, the rental sales associate did not hand the customer the Rental Jacket until after the customer had signed the U.S. Agreement. Thus the customer could not readily infer what document was referred to, as he or she might have done if presented with the two simultaneously.

To add to the confusion, the document referred to as the "rental jacket" is not titled "Rental Jacket." Instead it bears the title "Rental Terms and Conditions." Indeed, the so-called Rental Jacket does not even contain that term as a highlighted header anywhere in the document; only in the middle of the second numbered paragraph does it use the similar (but not identical) term "Rental Document Jacket."

Together, these undisputed facts compel a conclusion that the Rental Jacket is not "described in such terms that its identity may be ascertained beyond doubt." *Quinn*, 410 N.J. Super. at 533. A reasonable customer could very well have been—indeed, probably was—in the dark as to the meaning of the undefined cross-reference to the "rental jacket." This is not a close case; it falls far short of the clarity required by the "description factor." *See Alpert, supra; James, supra. See also Atalese*, 219 N.J. at 314 ("Arbitration clauses—and other contractual clauses—will pass muster when phrased in plain language that is understandable to the reasonable consumer."); *NAACP of Camden Cty. E. v. Foulke Mgmt. Corp.*, 421 N.J. Super. 404, 425, 24 A.3d 777, 790 (App. Div. 2011) ("[T]he clarity and internal consistency of a contract's arbitration provisions are important factors in determining whether a party reasonably understood those provisions and agreed to be bound by them.").

I move to the "knowledge and assent" factor. Here, we may even indulge the assumption that a reasonable customer could piece together the meaning of "rental jacket" when he or she was handed the Rental Agreement, folded

21

inside the "Rental Terms and Conditions" (*i.e.,* the Rental Jacket). At that point however, each U.S. Plaintiff had *already* signed the U.S. Agreement. Contractual assent had *already* been given. Just as in *Quinn,* it is here true "without dispute that [plaintiffs] were not shown and did not see the document" until after they signed the relevant contract containing the incorporation-by-reference. *Id.* As in *Quinn,* "there was never any discussion concerning" the terms of the putatively incorporated document prior to the signing of the agreements. *Id.* Those facts, said the *Quinn* court, were the "most important[]" in determining whether the external document was incorporated by reference. So too here. These undisputed facts easily create the necessary level of doubt under New Jersey law as to whether the U.S. Plaintiffs knew of and assented to the terms of the Rental Jacket when entering into the contract. Indeed, the conclusion is nearly inescapable that they did not. Thus New Jersey's stringent "beyond doubt" standard, while applicable, is not critical to my analysis. *See* Section III.D.2, *infra.*

As I noted in the MTD Opinion, the *Quinn* contract was an attorney retainer agreement. (*See* MTD Opinion at 17-19). That, to be sure, is different from a one-shot commercial transaction between a car rental company and a customer, which does not involve a relationship of trust or confidence. Nevertheless, courts have repeatedly applied *Quinn* outside the attorney-client context, rejecting attempts to distinguish it on that basis,[12] and have thereby confirmed that the principles it sets forth are part of the "general contract law" of New Jersey. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.,* 866 F. Supp. 2d 315, 335 (D.N.J. 2011) (applying and declining to distinguish *Quinn* "on the basis of the fact that the plaintiff seeking to impose the incorporated terms was an attorney," because the *Quinn* "court was clear that the proposition regarding

---

[12]    *See Blue Sky 1, LLC v. Jaguar Land Rover N. Am., LLC,* No. 16-207, 2016 WL 6803081, at *9 (D.N.J. Nov. 16, 2016) (in dispute between car dealership and consulting firm, asset purchase agreement did not incorporate consulting agreement, under *Quinn*); *James v. Glob. TelLink Corp,* 852 F.3d 262, 266 (3d Cir. 2017) (citing *Quinn* for the principle that incorporation by reference requires the party bound by the terms to have had knowledge and assented to the terms).

incorporation of absent terms by reference was a question of general contract law, not specific to the attorney-client relationship."), *vacated on other grounds*, 716 F.3d 764 (3d Cir. 2013).

I am confirmed in that conclusion by persuasive authority that deals more specifically with vehicle rental contracts. In the MTD Opinion, I summarized a comparable case from the Supreme Court of Appeals of West Virginia that addresses the incorporation-by-reference issue. (MTD Opinion at 19-21, discussing *State ex rel. U-Haul Co. of W. Virginia v. Zakaib*, 232 W. Va. 432, 443 (2013)). I here review *Zakaib* again, this time with the factual context of the parties' summary judgment submissions.[13]

The *Zakaib* plaintiffs were renters of U-Haul equipment. Some signed a one-page rental contract that stated "I acknowledge that I have received and agree to the terms and conditions of this Rental Contract and the Rental Contract Addendum." Others, after viewing a rental contract on an electronic terminal, clicked "accept" in response to the prompt "By clicking Accept, I agree to the terms and conditions of this Rental Contract and Rental Contract Addendum." *Id.* at 436-37. In either case, however, the renter did not actually receive a copy of the "Rental Contract Addendum" until after he or she had signed the rental contract. *Id.* at 437.

The Addendum in *Zakaib* was a cardstock pamphlet that held documents. It displayed advertisements and instructions for returning rented equipment. *Id.* The Addendum bore the title "Rental Contract Addendum." (Unlike "Retail Jacket," this was at least the same name used in the incorporation language of the contract.). The text of the Addendum included the following guidance: "Additional Terms and Conditions for EQUIPMENT Rental, Place Rental Contract documents in this folder & keep available throughout your move." *Id.*

---

[13]     In the MTD Opinion I also evaluated a comparable case from New York state court. (*see* MTD Opinion at 19-21); *Kenner v. Avis Rent A Car Sys., Inc.*, 254 A.D.2d 704, 704–05, 678 N.Y.S.2d 213 (1998). Defendants concede that the present case, unlike *Kenner*, does not involve disputed issues of material fact. (Def. Br. at 15, n. 3).

When the *Zakaib* plaintiffs sued U-Haul for assessing hidden charges, U-Haul moved to compel arbitration, based on an arbitration clause in the Addendum. The trial court denied the motion. The West Virginia Supreme Court announced a standard for incorporation by reference ("unmistakable . . . beyond doubt") akin to that of New Jersey.[14] Applying that standard, it affirmed the trial court's ruling that the agreement did not effectively incorporate the arbitration clause in the Addendum:

> Both U-Haul's pre-printed Rental Contracts and electronic contracts succinctly referenced the Addendum. However, such a brief mention of the other document simply is not a sufficient reference to the Addendum to fulfill the proper standard. The reference to the Addendum is quite general with no detail provided to ensure that U-Haul's customers were aware of the Addendum and its terms, including its inclusion of an arbitration agreement. The lack of a detailed description is compounded by the fact that the Addendum itself was designed to look more like a document folder advertising U-Haul products, services, and drop-off procedures, rather than a legally binding contractual agreement. *Finally, and most troubling to this Court, is the fact that U-Haul's practice was to provide customers a copy of the Addendum only after the Rental Agreement had been executed.* Under these circumstances, there simply is no basis upon which to conclude that a U-Haul customer executing the Rental Agreement possessed the requisite knowledge of the contents of the Addendum to establish the customer's consent to be bound by its terms, which

---

[14] The West Virginia court's standard, in more detail, was as follows:

> [I]n the law of contracts, parties may incorporate by reference separate writings together into one agreement. However, a general reference in one writing to another document is not sufficient to incorporate that other document into a final agreement. To uphold the validity of terms in a document incorporated by reference, (1) the writing must make a clear reference to the other document so that the parties' assent to the reference is unmistakable; (2) the writing must describe the other document in such terms that its identity may be ascertained beyond doubt; and (3) it must be certain that the parties to the agreement had knowledge of and assented to the incorporated document so that the incorporation will not result in surprise or hardship.

*Id.* at 444.

terms include the arbitration agreement sought to be enforced by U–Haul in this case.

*Id.* at 444 (*italic* emphasis added).

The *Zakaib* analysis is persuasive, and the undisputed facts of this case lead to the same conclusion. In both cases, the clauses supposedly incorporating the external document only "brief[ly] mention" that external document. The references are "quite general," with "no detail provided to ensure that [the] customers were aware of the" external document or its terms, "including its inclusion of an arbitration agreement." *Id.* The *Zakaib* court found "most troubling" the fact that U-Haul provided a copy of the external document to the customer only after the rental agreement had been executed, and did not discuss the external document with the customer prior to executing the rental agreement. *Id.* Here too, those facts are undisputed and are equally troubling. (PSMF ¶¶ 1, 2; DRPSMF ¶¶ 1, 2).

Defendants do not attempt to distinguish *Zakaib,* but instead argue that West Virginia's rule disfavors arbitration provisions and therefore violates the *Kindred* preemption principle. (Def. Br. at 15, n. 3). I disagree. The *Kindred* preemption principle forbids states from imposing rules of contract law that either facially or covertly disfavor arbitration agreements *vis-à-vis* other contracts. *See Kindred*, 137 S. Ct. at 1426. The rule of contract law in *Zakaib,* however, pertains to incorporation-by-reference generally; it does not facially or covertly disfavor arbitration in general, or arbitration of any particular type of claim.

What the *Zakaib* rule *does* disfavor is incorporation of an external document that is not properly assented to or is insufficiently described in the main contract. *Zakaib*, 232 W. Va. at 443-44. That rule applies to any contract that incorporates an external document by reference. *See id.* Just as New Jersey applied the *Quinn* rule not only to retention agreements but to contracts generally, courts applying *Zakaib* have applied it not just to arbitration agreements but to contracts generally. *See also SWN Prod. Co., LLC v. Edge,* No.

25

5:15-cv-108, 2015 WL 5786739, at *5 (N.D.W. Va. Sept. 30, 2015) (applying *Zakaib* incorporation by reference framework to contract dispute that did not involve a question of whether to compel arbitration); *Covol Fuels No. 4, LLC v. Pinnacle Min. Co., LLC*, 785 F.3d 104, 114 (4th Cir. 2015) (same); *Mazzella Lifting Techs., Inc. v. Farmer*, No. 1:16-cv-395, 2017 WL 4883238, at *4 (N.D. Ohio Jan. 20, 2017) (same). This rule does not discriminate against agreements to arbitrate, but places them "on the same footing as other contracts," consistent with the design of the FAA. *Century Indem. Co.*, 584 F.3d at 522.

I conclude that the incorporation-by-reference analysis of *Quinn* and *Zakaib* is not some idiosyncratic doctrine designed to obstruct arbitration; it is part of those states' general law of contracts. Thus it stays on the good side of the *Kindred* preemption principle, because it does not disfavor arbitration in particular, but disfavors vague incorporation-by-reference across the board.

The defendants cite the settled principle of contract law that parties are bound to provisions they assented to but did not read. (*E.g.,* Def. Br. at 1-2) ("Plaintiffs' position that they are not at all bound by any of the provisions in the Rental Jacket simply because they did not read them is wholly without merit."). In doing so, they set up a straw man. The plaintiffs did not sign or assent to a Rental Jacket without reading it. They were not even presented with the Rental Jackets until after they signed the Agreements. Because the only reference to the Rental Jacket was the incorporation language in the Agreement, the law of incorporation applies.

It is true, of course, that notice of contractual terms *may* be sufficient even if a party declines to take advantage of the opportunity to read them. Defendants repeatedly cite *Noble v. Samsung Elecs. Am., Inc.*, 682 F.App'x 113 (3d Cir. 2017), a non-precedential opinion from the Third Circuit, for the proposition that under New Jersey law, if a party assents to a contract and is given "reasonable notice" of the contractual terms, that party "is bound by those terms, even if he [or she] failed to read them." *Id.* at 116. "The "reasonable notice" here, say defendants, is that if the plaintiffs had asked to

26

review the Rental Jackets, the rental sales associates would have provided a copy.

*Noble* itself, however, goes on to note that "'when the writing does not appear to be a contract and the terms are not called to the attention of the recipient,' there is no reasonable notice and the terms cannot be binding.'" *Id.* (quoting *Specht v. Netscape Communications Corp.*, 306 F.3d 17, 30 (2d. Cir. 2002)). "Therefore, contractual terms, including an arbitration clause, will only be binding when they are 'reasonably conspicuous,' rather than 'proffered unfairly, or with a design to conceal or de-emphasize its provisions.'" *Id.* (quoting *Caspi v. Microsoft Network, L.L.C.*, 323 N.J. Super. 118, 732 A.2d 528, 532 (App. Div. 1999)). *Noble* therefore affirmed the district court's *denial* of a motion to compel arbitration, reasoning that although the extrinsic arbitration provision was "readily available," its "terms were buried in a manner that gave no hint to a consumer that an arbitration provision was within." 682 F. App'x at 116. *Noble* does not stand for the proposition that theoretical access to a document is sufficient to constitute "reasonable notice" of its terms.[15]

---

[15]     The defendants also urge the Court to consider, *inter alia*, *Benson v. Budget Rent A Car Sys. Inc.*, No. 08-cv-4512, 2011 WL 4528334, at \*4 (E.D. Pa. Sept. 29, 2011), in which a federal court in the Eastern District of Pennsylvania held on summary judgment that a rental agreement similar to that of the U.S. Plaintiffs' Agreements properly incorporated a rental jacket by reference. There, unlike here, the court noted that the customer "received and read" the rental jacket.

Similarly, the defendants urge the Court to consider *Tantillo v. CitiFinancial Retail Servs., Inc.*, No. 12-cv-511, 2013 WL 622147, at \*4 (D.N.J. Feb. 19, 2013), in which a federal court in the District of New Jersey granted the party's motion to compel arbitration when the arbitration clause was part of an external document incorporated by reference. But there, unlike here, the main agreement described the incorporated document with specificity, listing within the main contract the date, title, and publication number of the external document. And, importantly, the main contract itself explicitly alerted the customer that the external document contained an arbitration provision. *Id.* at \*4-\*9 (noting that the main contract included a provision stating that "Paragraph 27 of the [external document] contains provisions requiring arbitration of various claims and controversies."). Thus, in signing the main contract, the customer explicitly "acknowledged the existence of another document that contained an applicable arbitration provision." *Tantillo*, 2013 WL 622147, at \*9.

Other cases cited by the defendants are similarly distinguishable. Principally, those other cases did not address incorporation by reference at all; involved plaintiffs

Neither the holding of *Noble* nor New Jersey's general incorporation-by-reference rule runs afoul of the well-established principle that "a party accepting an offer has an absolute duty to read and understand the terms of an offer, and failure to do so will not diminish the force and effect of the resulting contract." *66 VMD Assocs., LLC v. Melick-Tully & Assocs., P.C.*, No. A-4008-09T3, 2011 WL 3503160, at *6 (N.J. Super. Ct. App. Div. Aug. 11, 2011). Under New Jersey law, for example, a defendant has no obligation to alert a plaintiff to an arbitration provision (or any other provision) that is contained within the contract that the plaintiff is signing: "Failing to read a contract does not excuse performance unless fraud or misconduct by the other party prevented one from reading." *Gras v. Assoc's First Capital Corp.,* 346 N.J. Super. 42, 56, 786 A.2d 886 (App. Div. 2001) (internal quotation and citation omitted).

At most, however, this principle suggests that knowledge may be imputed under limited circumstances not present here. For knowledge to be imputed, the contracting party must have been given the incorporated document or specifically directed to it in such a way that there was a real opportunity to read its terms. That did not happen here. I would not impute knowledge where a plaintiff has merely been told that there exists some other item (a "rental jacket"), location and contents unknown, which will be furnished after the contract is signed, and bears a title other than "rental jacket."[16]

This is just another way of saying that effective incorporation by reference requires that, before giving assent by signing the contract, the renter

---

who had read or been given the opportunity to review the incorporated terms; or involved plaintiffs that had been specifically made aware of an arbitration waiver in the incorporated document.

[16]     Mind you, the Rental Jacket is sitting on the desk, at the elbow of the sales agent, during the entire rental transaction. That is not mere happenstance; the agent has been *instructed* to supply the jacket only after the contract is signed.

must have been able to identify beyond doubt[17] the document that is referred to, and to ascertain the contents of the relevant terms. The U.S. Agreements at issue here did not meet that standard. Plaintiffs Alexander, Bacon, Davidson, and DeVries did not assent to the purportedly incorporated arbitration provision, and it is not part of their contract. As to these plaintiffs, the motion to compel arbitration is denied.

## 2. Florida Law and the U.S. Agreements

As noted above, the incorporation-by-reference issue as to plaintiffs Geary and Wheeler is governed by Florida law. Florida's incorporation-by-reference standard is not as exacting as New Jersey's "beyond doubt" standard. Florida law requires only that the incorporated document be "sufficiently described or referred to in the incorporating agreement." *BGT Grp., Inc. v. Tradewinds Engine Servs., LLC*, 62 So. 3d 1192, 1194 (Fla. Dist. Ct. App. 2011). Based on the undisputed facts of this case, and applying the summary judgment standard, I find that Florida law nevertheless does not require a different result. I therefore will likewise deny the motion to compel arbitration as to Geary and Wheeler.

Here is the standard under Florida law:

> To incorporate by reference a collateral document, the incorporating document must (1) specifically provide "'that it is subject to the incorporated [collateral] document'" and (2) the collateral document to be incorporated must be "'sufficiently described or referred to in the incorporating agreement'" so that the intent of both parties may be ascertained.

*Spicer v. Tenet Florida Physician Servs., LLC*, 149 So. 3d 163, 166 (Fla. Dist. Ct. App. 2014).

In *Spicer*, the plaintiff's employment agreement with the defendant contained the following incorporation language: "you agree that any and all disputes regarding your employment with [the defendant], including disputes

---

[17]     I repeat that the "beyond doubt" standard, while it is the correct one under New Jersey law, is not critical to the analysis. *See* Section III.D.2, immediately following.

relating to the termination of your employment, are subject to the Tenet Fair Treatment Process ["FTP"], which includes final and binding arbitration." *Id.* at 164. The agreement also stated, "If you have any questions, please [] feel free to contact [] me in the Human Resources Department at [phone number]." There were no specific directions in the employment agreement as to how the employee could locate or obtain a copy of the FTP, and the plaintiff did not in fact receive a copy of the FTP until seventeen days after signing the employment agreement. *Id.* at 164. When the plaintiff filed a lawsuit related to his employment, the defendants moved to compel arbitration pursuant to the terms of the arbitration provision in the FTP.

A Florida appeals court held that the employment agreement did not effectively incorporate the FTP:

> [M]erely providing a telephone number in a document for a party to call "if you have any questions" is not sufficient to meet *the requirement of giving the location of a document to be incorporated by reference.*
>
> We conclude that the employment agreement, standing alone, did not contain a legally sufficient arbitration agreement because it failed to set forth some procedures by which arbitration was to be effected. Although the employment agreement clearly stated that any and all disputes were "subject to" the FTP, the FTP was *not sufficiently described in the employment agreement or attached and no location was given as to where the FTP could be found.*

*Id.* at 167-68 (emphasis added).

On the undisputed facts before me, the standard applied in *Spicer* yields the same result as the New Jersey standard. The plaintiff must receive an incorporated document, or else be given clear direction on how to access it, before signing the agreement that allegedly incorporates that extrinsic document. Defendants Avis and Payless failed to provide Geary and Wheeler with the necessary access to the Rental Jackets here. They were not given the Rental Jackets until after they signed their Rental Agreements. The Rental Agreements did not describe the Rental Jacket or state where it could be found.

Nor did the Rental Agreements, like the one found *not* adequate in *Spicer,* alert Geary and Wheeler even generally to the contents of the Rental Jacket or the fact that it contained an arbitration clause.

Contrary to defendants' assertion, these Rental Jackets were not accessible or plainly noticeable. Much ink is spilled on the issue of the jackets' visibility during the rental transaction. I cannot find that any version of the standard requires the consumer to officiously take it upon herself to read a fine print document on the agent's desk upside-down. What is critical is that the Rental Agreement did not define the meaning of a "rental jacket," the customers were not directed to it in any way, and the document did not actually even bear that title.

*Spicer* relied on *BGT Group, Inc. v. Tradewinds Engine Services, LLC,* 62 So. 3d 1192, 1193 (Fla. Dist. Ct. App. 2011), a case upholding the denial of a motion to compel arbitration. There, the plaintiff executed a purchase order that incorporated by reference certain terms and conditions that contained an arbitration clause. The purchase order stated: "ALL QUOTATIONS, INVOICES AND ORDERS ARE SUBJECT TO THE ATTACHED BGT TERMS AND CONDITIONS." *Id.* at 1194. (Apparently they were not "attached," however; the plaintiff did not actually receive the terms and conditions until a contract dispute had arisen.) The court reasoned that "cases finding sufficient description of a collateral document to create an incorporation by reference involve more detailed descriptions of the collateral document, or where the document could be found . . . ." *Id.* at 1195. It cited two examples:

> [I]n *Kaye v. Macari Building & Design, Inc.,* 967 So.2d 1112, 1113 (Fla. 4th DCA 2007), the collateral document was described as "The American Institute of Architects Documents No. A–201, April 1997 Edition," an industry standard. And in *Avatar Properties, Inc. v. Greetham,* 27 So.3d 764, 766 (Fla. 2d DCA 2010), although a home warranty was not attached to a purchase and sale agreement, "the agreement state[d] that the warranty was available for examination at [the seller's] offices and, that upon request the warranty

31

would be attached as an exhibit to the purchase and sale agreement."

*Id.* at 1195. The *BGT Group, Inc.* court found it problematic that the purchase order did not provide any information "about where the 'terms and conditions' might be located." *Id.* (Indeed, the purchase order misleadingly stated that any such terms and conditions were "attached."). Again, Florida law, as described in *BGT Group, Inc.*, appears to embody a standard less stringent than that of New Jersey, but it nevertheless would compel a similar result as to plaintiffs Geary and Wheeler.[18]

Geary and Wheeler did not receive their Rental Jackets before signing their copies of the U.S. Agreements. The Agreements did not provide any information about where the Rental Jackets were located or how the customer could get access to them. The Rental Jackets were not otherwise meaningfully available for inspection; they were located on the desk underneath the rental counter, partially out of view; the text was upside-down from the customer's perspective; and the Rental Jackets did not actually bear the title "Rental Jacket."

The U.S. Agreement, here as before, makes no more than a bare reference to the existence of the Rental Jacket: "I have reviewed&agreed to all

---

[18]   Florida's "availability" standard made a difference, however, in *Access Telecom, Inc. v. Numaxx World Merchants, LLC*, No. 13-cv-20404, 2013 WL 12108129, at *7 (S.D. Fla. Nov. 25, 2013) (terms and conditions were incorporated by reference into purchase order in part because "[t]he Purchase Order specifically provide[d]: 'Please visit our website for terms and conditions at www.numaxx.com that govern this transaction. . . . [and] a reasonable user could easily navigate to the Terms and Conditions through only one mouse click from the homepage."). *See also Affinity Internet, Inc. v. Consol. Credit Counseling Servs., Inc.*, 920 So. 2d 1286, 1288 (Fla. Dist. Ct. App. 2006) (no incorporation by reference where contract stated it was "subject to all of [defendant's] terms, conditions, user and acceptable use policies located" . . . at a stated website," but "no printed version of the policies allegedly located at that website was attached to the contract" or subsequently provided to the plaintiffs). Those cases are distinguishable from the present case because the language seeking to incorporate the external documents described how to access the external documents and also provided website links to do so. The language in the Rental Agreements did not describe how to access the Rental Jackets, nor did they provide a means for accessing them.

notices&terms here and in the rental jacket." That is insufficient under the
Florida law of incorporation by reference, which "requires more than simply
making reference to another document in a contract." *Jenkins v. Eckerd Corp.*,
913 So. 2d 43, 51 (Fla. Dist. Ct. App. 2005). Such a document is effectively
incorporated only "if the contract specifically describes the document and
expresses the parties' intent to be bound by its terms." *Id.* (quoting
*Management Computer Controls, Inc. v. Charles Perry Construction, Inc.*, 743
So.2d 627, 631 (Fla. 1st DCA 1999) ("The contract must contain more than a
mere reference to the collateral document")). This unadorned reference to a
"rental jacket" does not satisfy that standard. *See id.*; *Vitacost.com, Inc. v.
McCants*, 210 So. 3d 761, 765 (Fla. Dist. Ct. App. 2017) ("Florida law requires
the agreement to specifically provide that the collateral document is being
incorporated and to sufficiently describe the collateral document to be
incorporated."); *see also Apopka Clear Lake Investments, LLC v. Sema Constr.,
Inc.*, No. 14-cv-881, 2015 WL 12830494, at *8 (M.D. Fla. Oct. 14, 2015).

Therefore, under Florida law, plaintiffs Geary and Wheeler will not be
deemed to have assented to the arbitration provisions found in the Rental
Jackets, which were not properly incorporated by reference into the Rental
Agreements. As to Geary and Wheeler, the motion to compel arbitration is
denied.

### 3. New Jersey Law and the Costa Rica Agreement

As outlined above, the incorporation-by-reference issue for the Costa
Rica Fill-In Agreement is also governed by New Jersey law. *See supra* at 16-17;
MTD Opinion at 11-16 (choice of law analysis). The facts of plaintiff Arcadia
Lee's rental transaction, however, differ from the others, so I discuss it
separately. *See* pp. 7-10, *supra* (factual overview).

Preliminarily, there is a skirmish over whether the incorporation-by-
reference analysis applies to the Costa Rica transaction at all. The Costa Rica
Terms and the Costa Rica Fill-In Agreement, recall, are printed on two sides of
the same sheet of paper. Defendants argue that they therefore constitute a

single, integrated document. (Def. Br. at 36-37; Def. Reply at 39-40). True, the single-sheet scenario may ease the defendants' burden of proof. Either way, however, it is fundamental that for Lee to be bound by the arbitration provision, she must have had reasonable notice of the Costa Rica Terms. *See Atalese*, 219 N.J. at 444-47; *Noble*, 2017 WL 838269, at *3 (discussing New Jersey Appellate Division cases and noting that under New Jersey law mutual assent "necessarily requires reasonable notice to each contracting party of the contractual terms," including an arbitration clause).

The issue of whether Lee received reasonable notice requires the court to find facts and weigh their significance. Because some of those material facts are in dispute and because weighing them is the province of a fact finder, the issue is inappropriate for disposition on summary judgment. Therefore, I deny both parties' motions for summary judgment on the question of whether Lee agreed to arbitrate her claims.

The Costa Rica Fill-In Agreement is a receipt-like document. That Agreement, on the face of the sheet, is similar to the U.S. Agreement. The Costa Rica Fill-In Agreement does not refer even generally to the existence of any other agreement, extrinsic terms, or rental jacket. *A fortiori* it does not direct the reader's attention to any arbitration clause. Near the bottom of the page, above the signature line, it states, "By signing below, you agree to the terms and conditions of this Agreement, and you acknowledge that you have been given an opportunity to read this Agreement before being asked to sign." (DE 81-8). Lee signed the Costa Rica Fill-In Agreement on the face of the sheet.

On the reverse side of the Costa Rica Fill-In Agreement is a preprinted set of terms (the "Costa Rica Terms"), entitled "Rental Agreement." The Costa Rica Terms are similar to those contained in the U.S. Rental Jackets, discussed above, and they include an arbitration provision. The Costa Rica Terms page has its own, separate signature line. Although Lee signed the Costa Rica Fill-In Agreement on the face of the sheet, she did not execute the signature line of the Costa Rica Terms on the reverse. The Costa Rica Terms define the "Parties" to the agreement as including the "persons whose data is detailed on the face

of this document and whose signatures are affixed at the bottom, as well as any other individuals or entities in which name the car-rental invoice is issued by instructions of the signatory who shall be jointly liable for the obligations hereunder acquired." (DE 81-8).

Defendants contend that Lee was placed on constructive notice of the Costa Rica Terms when she was handed the sheet of paper, even if she did not actually turn over the paper and read the Terms. Defendants also point to the collision damage waiver on the front-side Costa Rica Agreement, which states that it is "Subject to the Terms and Conditions, stated on this countract [sic]." The prefatory admonition to the signature line states that the signer assents to "the terms and conditions of this Agreement." (Id.). Defendants say that these references were enough to put Lee on constructive or actual notice that there were additional terms on the back of the paper. The language, however, is ambiguous at best. It does not direct the reader to "terms and conditions" that appear elsewhere; if anything, it tends to suggest that the "terms and conditions" consist of what appears on the front side of the form—i.e., that to which the customer agrees by signing the front side. And of course they do not specifically refer to arbitration at all.

Plaintiffs emphasize the following facts: The rental sales associate never directed Lee to the Costa Rica Terms on the reverse side of the Costa Rica Fill-In Agreement; the rental sales associate never discussed with Lee the existence or substance of the additional terms; the Costa Rica Fill-In Agreement does not explicitly state anywhere that there are additional contract terms on the reverse side of the paper; the reverse side, although it could be described as containing terms and conditions, does not bear that title; the back-side Costa Rica Terms have their own signature line, which Lee never signed; and the video does not show that Lee was directed to turn over the sheet to review the Costa Rica Terms, or that she actually did so.

Under the New Jersey incorporation-by-reference standard, the language of the contract must permit a reasonable consumer to "ascertain[] beyond

doubt" the additional, extrinsic terms. *Quinn,* 410 N.J. Super. at 533. Neither party presents any case law on the specific question of whether terms on the reverse side of an agreement (as opposed to a separate document) are subject to the incorporation-by-reference analysis. Even in a unitary written contract, however, New Jersey courts have looked to the conspicuousness of an arbitration clause when determining whether a party was put on reasonable notice of it. *Noble,* 2017 WL 838269, at *3; *Kuhn v. Terminix Int'l Co., L.P.,* No. A-1518-07T3, 2008 WL 1987432, at *2 (N.J. Super. Ct. App. Div. May 9, 2008) ("[T]he subject contract does not provide the consumer with reasonable notice of the arbitration provision" because the arbitration clause was "obscured in appearance and location in the contract; it is one of twelve general conditions undistinguishable from all the other boiler-plate provisions."); *Rockel v. Cherry Hill Dodge,* 368 N.J. Super. 577, 585, 847 A.2d 621, 627 (App. Div. 2004) ("The size of the print and the location of the arbitration provision in a contract has great relevance to any determination to compel arbitration, particularly when, like here, the provision is contained in a contract of adhesion. . . . [T]he arbitration provisions in the retail installment contract are difficult to locate and, once found, onerous to read in light of the small size of the print. There is also no language on the first page of the document, in print distinguishable by its greater size or different color from the rest of the words on the page, which warns that the right to pursue a lawsuit in court or the waiver of statutory claims or the right to trial by jury will be affected or eliminated by provisions contained elsewhere in the document.").

Some cases, most of them decades old or from other jurisdictions, have addressed the question of whether language on the reverse side of a document has been assented-to. The common lesson to be drawn from those cases is that the issue is a factual one. Faced by conflicting evidence as to whether the reverse side was properly called to the signer's attention, they generally have denied summary judgment. "A party should not be bound by clauses printed on the reverse side of a document unless it be established that such matter was properly called to its attention and that it assented to the provisions there

stated. . . . In view of the conflicting claims and the nature of the writings in issue, a question of fact exists as to whether the [party] became aware or could reasonably be expected to observe the contents of the printed material before he signed his name." *Tri-City Renta-Car & Leasing Corp. v. Vaillancourt*, 33 A.D.2d 613, 614, 304 N.Y.S.2d 682, 684 (1969) (affirming denial of summary judgment) (internal quotations omitted); *Arthur Philip Exp. Corp. v. Leathertone, Inc.*, 275 A.D. 102, 105, 87 N.Y.S.2d 665, 667 (App. Div. 1949) (same).[19]

Here too, a question of fact exists as to whether the reverse side of the document, containing, *inter alia,* the arbitration provision, was reasonably called to Lee's attention. If Lee had executed both the front and back signature lines, this would be an easier case for summary judgment. But she executed, and apparently was asked to execute, only the front. An additional factual issue arises, then, as to the possible lulling effect of the signature line on the front of the document, which could have left (and here, possibly did leave) the impression that there was nothing more to be read or done. The sales associate only confirmed that impression by instructing Lee to sign in only one place.[20]

The parties dispute whether the rental sales associate actually displayed the paper in a manner that would have shown, at least generally, that there was something printed on the back. (PSMF ¶¶ 49-51; DRPSMF ¶¶ 49-51;

[19]    *See also Emery Worldwide, a Subsidiary of CNF, Inc. v. AAF-McQuay, Inc.*, No. 2003-CA-001446-MR, 2005 WL 2402544, at *3 (Ky. Ct. App. Sept. 30, 2005) (applying Kentucky law); *Miller v. Lykes Bros. S.S. Co.*, 467 F.2d 464 (5th Cir. 1972) (noting "the general rule that mere notices insufficient to bring the passenger's attention to restrictions set forth on the reverse side of tickets do not incorporate the restrictions into the contract of passage.") (collecting cases); *Grossman Furniture Co. v. Pierre*, 119 N.J. Super. 411, 421-22, 291 A.2d 858, 864 (Dist. Ct. 1972) (collecting cases); *Arthur Philip Exp. Corp. v. Leathertone, Inc.*, 275 A.D. 102, 105, 87 N.Y.S.2d 665, 667 (App. Div. 1949) ("A party should not be bound by clauses printed on the reverse side of a document unless it be established that such matter was properly called to its attention and that it assented to the provisions there stated."); *The Majestic*, 166 U.S. 375, 384, 17 S. Ct. 597, 601, 41 L. Ed. 1039 (1897) ("[A]lthough a common carrier might limit his common-law liability by special contract, assented to by the consignor of goods, an unsigned notice printed on the back of a receipt did not amount to such contract, though the receipt with such notice on it might have been taken by the consignor without dissent.").

[20]    I set aside the implications of these idiosyncratic facts for class certification.

DSMF ¶ 209; PRDSMF ¶ 209; DRPR ¶ 209). The parties also dispute whether the language of the front-side Costa Rica Fill-In Agreement indicates that there are additional terms and conditions on the reverse side. For the reasons stated above, this is an open question. A finder of fact could easily conclude that the collision damage waiver itself, along with the other initialed paragraphs on the Costa Rica Fill-In Agreement, *themselves* constitute the "terms and conditions." It is possible, however, that a reasonable consumer could have understood this as a reference to additional terms and conditions on the reverse.

These disputed facts are genuine and material to the issues in suit. A fact finder must determine whether Lee was on reasonable notice of the arbitration provision found within the Costa Rica Terms. Summary judgment on the question of arbitrability is therefore denied as to the Costa Rica rental transaction of plaintiff Lee.

### E. Third-Party Booking Websites' Terms of Use

As noted above, the defendants have another, alternative argument in relation to those plaintiffs who booked their reservations through third-party Booking Websites, such as Expedia.com. Those websites' Terms of Use, they say, contain their own arbitration provisions that would cover these overcharge claims. The plaintiffs respond initially that much of the evidence relating to the booking of such reservations and the websites' terms of use is not proffered in admissible form. Assuming there was evidence of contractual assent, the plaintiffs say, these add-on charges, imposed by the rent-a-car companies at the end of the rental, are nevertheless beyond the scope of the arbitration provisions in the third-party Booking Websites' terms of use. (Def. Br. at 25-34).

The issue regarding admissibility of the evidence of assent breaks down further into two components. The first concerns the layout and details of the Booking Websites at the time the plaintiffs used them. The second concerns the contemporaneous content of the Booking Websites' Terms of Use (which allegedly contain the arbitration clauses). For the reasons stated below, my decision process stalls at the first step. The certification purporting to describe

38

the layout and details of the Booking Websites is not sufficiently based on personal knowledge. I will therefore permit additional discovery on this issue pursuant to Federal Rule of Civil Procedure 56(e). Because additional arguments regarding the Terms of Use are likely to be altered or even mooted by such additional discovery, I do not reach them.

Defendants attach a certification from Matt Enderle, an Avis employee who has worked on Payless relationships and accounts with travel booking websites since April 2014, including the Booking Websites at issue in this case. (DE 81-14). Mr. Enderle is "generally familiar with the terms and conditions" on the booking websites, which he "review[s] and reference[s] from time to time as part of [his] job." (*Id.* ¶ 7).

Mr. Enderle's certification attaches screenshots of the Booking Websites in an attempt to document the process that plaintiffs underwent when reserving their rentals online. (*Id.* ¶¶ 12, 17, 27). Those screenshots, however, date from over a year after the named plaintiffs actually used the websites to book their rentals.

Thus, for example, Mr. Enderle attaches screenshots of the Expedia.com website dating from December 11, 2017. Plaintiffs Alexander and Geary booked their rentals through Expedia.com nearly eighteen months earlier, on June 21 and June 17, 2016. (DSMF ¶¶ 65, 66). The time gap is papered over with say-so: "The process for booking a Payless rental on Expedia.com now," says Mr. Enderle, "is the same process that existed at the time Mr. Alexander and Ms. Geary booked their Payless rentals in 2016." (DE 81-14 ¶ 12). As to reservations booked through two other websites, Hotwire.com and Priceline.com, the Enderle certification attaches similar screen shots and makes similar statements.[21] No evidence from any employee of those websites is offered.

---

[21]     The screenshots for Hotwire.com date from December 20, 2017. (DE 81-14 ¶ 20). Plaintiffs Bacon and DeVries booked their rentals online through Hotwire.com on May 23 and July 16, 2016. (DSMF ¶¶ 81, 82). The Priceline.com screenshots date from December 20, 2017. (DE 81-14 ¶ 27). Plaintiff Davidson booked his rental online

Mr. Enderle's certification goes on to describe the process the plaintiffs would have experienced when booking their rentals online. For example, he describes the locations of hyperlinks used to access the Terms of Use (DE 81-14 ¶¶ 13, 21, 28); what a customer had to click in order to complete a reservation (*Id.* ¶¶ 15, 23, 30); the text within the box that acknowledged the customer's assent to the Terms of Use (*Id.* ¶¶ 15, 23, 30); and the requirement of clicking large colored boxes to acknowledge having read and accepted the Terms of Use. (*Id.* ¶¶ 16, 24, 31). Those facts are highly material to the question of whether plaintiffs properly assented to the Booking Websites' Terms of Use. *See Hite v. Lush Internet Inc.*, 244 F. Supp. 3d 444, 451 (D.N.J. 2017) (examining whether a website gave reasonable notice of the terms of use and recognizing that New Jersey courts apply a 'reasonable notice' standard to the manner in which contract terms are displayed in determining whether they are enforceable, including looking to the style or mode of presentation, and the placement of the provision (internal quotations omitted)); *see also Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 35 (2d Cir. 2002) ("Reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility.").

If the plaintiffs did not assent to the Booking Websites' Terms of Use, they cannot be bound by the arbitration provisions found therein. *See James v. Glob. TelLink Corp*, 852 F.3d 262, 265 (3d Cir. 2017). It follows that if the evidence as to the reservation process on the websites were inadmissible or otherwise insufficient, the Court would lack a sufficient basis to find there was an agreement to arbitrate.

On summary judgment, a movant's adversary "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2); *Countryside Oil Co.,*

---

through Priceline.com on June 7, 2016. (DSMF ¶ 97). In these cases, too, Mr. Enderle states that the process has not changed since 2016.

*Inc. v. Travelers Ins. Co.*, 928 F. Supp. 474, 482 (D.N.J. 1995). Federal Rule of Evidence 901(a) states that "to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). On summary judgment, such a foundation is ordinarily supplied, or at least its existence is suggested, by affidavit or other sworn statement. Such a certification, like any other, "shall be restricted to statements of fact within the personal knowledge of the signatory." *Countryside Oil Co., Inc.*, 928 F. Supp. at 482; *see also* Local Civ. R. 7.2(a); *Steele v. Depuy Orthopaedics, Inc.*, 295 F. Supp. 2d 439, 446 (D.N.J. 2003); *Fowler v. Borough of Westville*, 97 F. Supp. 2d 602, 607 (D.N.J. 2000).

I do not find a sufficient basis for knowledge in Mr. Enderle's statement that he "review[s] and reference[s] [the booking process] from time to time as part of [his] job." (*Id.* ¶ 8). Such a statement does not suffice to support his conclusory assertion that the layouts and procedures of the websites when the plaintiff used them in mid-2016 were precisely those he observed at the end of 2017. Defendants' presentation is, however, suggestive, and such information, if it exists, should be readily available from the operators of the websites.

One option would be to simply rule that defendants' proofs have failed and to deny arbitration on this basis. Where there has been full discovery and a party's case has failed on the merits, that option is often appropriate. In such a case, summary judgment will have served its purpose of narrowing and defining the issues to be tried. Here, however, there has been only limited discovery, and denial of defendants' motion will not end the case, but rather guarantee that it go forward, meaning that further discovery is a foregone conclusion. That option, then, seems an improvident exercise of my discretion. Rule 56(e) affords the Court the additional option of permitting a party to

supplement its proofs.[22] That is the option I take here. The defendants, if they wish to do so, may ask the Magistrate Judge to help them schedule discovery so that they can seek necessary evidence of online assent in admissible form.

Assuming the plaintiffs have assented, there remains the issue of what they assented to. The defendants proffer evidence as to the Booking Websites' Terms of Use as of the dates that the plaintiffs booked their reservations. For this, they do not rely solely on Mr. Enderle's recollection. Rather, they also attach copies of those online Terms of Use that they obtained from the Internet Archive's "Wayback Machine." [23] (DE 81-30) Those retrieved Terms of Use documents are sponsored by an appropriate representative of the Internet Archive. (DE 81-29)

---

[22]     (e) Failing to Properly Support or Address a Fact. If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

  (1) give an opportunity to properly support or address the fact;

  (2) consider the fact undisputed for purposes of the motion;

  (3) grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it; or

  (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

[23]     The Internet Archive is a nonprofit online digital library. Among other things, it provides access to past internet websites and other cultural artifacts in digital form. (DE 81-29, "Butler Certification"). The Wayback Machine is named, of course, for the time-travel device employed by Mr. Peabody & Sherman in a beloved cartoon segment of the Rocky & Bullwinkle television show in the 1960s. It permits the user to view archived records associated with a particular URL, in effect preserving a snapshot of a website as it existed as of a particular date in the past. The archived data made viewable and browsable by the Wayback Machine is compiled using automated software programs known as crawlers, which surf the Web and intermittently store copies of internet files, which are then preserved in the archive. (Id.).

Defendants' motion includes a certification from Christopher Butler, an Office Manager at the Internet Archive, who declares that the exhibit attached to his certification includes true and accurate copies of printouts of the URLs listed from the specified dates. (DE 81-29). Those copies are the Booking Websites' Terms of Use that defendants offer as evidence and use as the basis for their arguments regarding the arbitration provisions found therein. (DE 81-30).

Here, defendants are on more solid ground. Although the issue is not free from doubt, there is case law support for the proposition that the Wayback Machine copies of the Terms of Use, particularly as corroborated by the Enderle certification, would be admissible. *See United States v. Bansal*, 663 F.3d 634, 667 (3d Cir. 2011); *United States v. Gasperini*, No. 16-CR-441 (NGG), 2017 WL 3140366, at *6 (E.D.N.Y. July 21, 2017), *aff'd*, 729 F. App'x 112 (2d Cir. 2018). At least there are strong indications that a proper foundation for admission could be laid at a trial of the arbitrability issue.

Should both assent and the particulars of the Terms of Use be established, many issues will remain before arbitration can be ordered. One such issue is choice of law, which may play out differently vis-à-vis the websites than it did in relation to the in-person car rental agreements.[24] Another is whether, under whatever law applies, a non-signatory may compel arbitration under these circumstances. Still another is the scope of the website arbitration provisions, for example, whether they extend to these defendants' alleged imposition of unauthorized charges after entering into new agreements with the customers, at or after the time the cars were returned. Given my rulings above, consideration of those issues would be premature.

## IV. CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment to compel arbitration (DE 81) is **DENIED** as presented. The plaintiffs' cross motion for summary judgment denying arbitration (DE 93) is **GRANTED IN PART** and **DENIED IN PART**.

More specifically:

1. The defendants' motion for summary judgment is denied outright to the extent it rests on the agreements signed in person by the plaintiffs when they rented their cars in the United States, and the plaintiffs'

---

[24] Certain of the submissions suggest that the contract law of as many as five states may govern the interpretation and effect of the Booking Websites' Terms of Use. Plaintiffs suggest that there may also be an issue as to whether New Jersey would honor such laws if they violate local public policy.

corresponding cross motion is granted to the same extent. Section II.D.1 & 2, *supra*.

2. The defendant's motion and the plaintiffs' cross motion are both denied to the extent that they rest on the agreement signed in person by the plaintiff who rented her car in Costa Rica, because factual issues remain. Section II.D.3, *supra*.

3. To the extent the motions rest on the terms of service on booking websites, I find that the record is not sufficiently developed. After appropriate discovery, the issue may be resolved on summary judgment or tried. Section II.E, *supra*.

Dated: December 7, 2018

HON. KEVIN MCNULTY, U.S.D.J.